---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

NATIONAL LABOR RELATIONS BOARD

Petitioner

v.

ARRMAZ PRODUCTS INC.

Respondent

On Application for Enforcement and Cross-Petitioner for Review
of an Order of The National Labor Relations Board

NLRB Case 12–CA–294086
December 6, 2022

---

**UNION INTERVENOR'S BRIEF IN SUPPORT OF PETITIONER
APPLICATION FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD**

---

Randall Vehar, Esq. (Ohio Bar No. 0008177)
UFCW Assistant General Counsel/
  Counsel for ICWUC/UFCW
1655 W. Market Street
Akron, Ohio 44313
330/926-1444
330/926-0950 FAX
rvehar@ufcw.org

*Attorney for Intervenor Union*

**INTERVENOR UNION'S CERTIFICATE OF INTERESTED PERSONS**

Pursuant to 11th Circuit Rule 26.1-2(b), Intervenor, International Chemical Workers Union Council (Intervenor, or Union), certifies that it believes the Certificate of Interested Persons and Corporate Disclosure Statement in the Brief of Respondent and Cross-Petitioner *Arrmaz Products Inc.* is complete, except as follows:

Respondent and Cross-Petitioner *Arrmaz Products Inc*. failed to include *AMP Trucking, Inc*., apparently a subsidiary, or affiliated, of *Arrmaz Products Inc*.


**STATEMENT REGARDING ORAL ARGUMENT**

The Union believes that oral argument is unnecessary since, as described more fully below, the Stipulated Election Agreement between *Arr-maz Products, Limited Partnership,* and the Union is clear and unambiguous and, alone, is sufficient to resolve the substantive issues in this case. Nevertheless, if oral argument is granted the Union reserves the right to participate on behalf of Appellee NLRB, as otherwise permitted by the rules.

# TABLE OF CONTENTS

INTERVENOR UNION'S CERTIFICATE OF INTERESTED PERSONS............ i

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF AUTHORITIES .................................................................................. iv

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES. vi

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION... vi

    A. Jurisdiction of the National Labor Relation Board......................................... vi

    B. This Court's Jurisdiction.................................................................................. vi

    C. Timeliness of NLRB's Petition for Review.................................................. vii

    D. The Appeal is From a Final Order. .............................................................. viii

STATEMENT OF THE ISSUES FOR REVIEW .....................................................1

STATEMENT OF THE CASE...................................................................................2

    A. Procedural Background.....................................................................................2

    B. Statement of Facts .........................................................................................11

SUMMARY OF ARGUMENT ...............................................................................16

LAW AND ARGUMENT .......................................................................................18

    I.  Standard of Review.........................................................................................18

    II.  The NLRB's Order, that resolved the remaining issues, finally, left after the *Ex-Cell-O* issue was severed, is enforceable. .................................................18

    III. Any challenge to the RD's finding, that, alternatively, the ***AMP*** employees do not have a sufficient community-of-interest with the ***ArrMaz*** employees, so as to require their inclusion in the ***ArrMaz*** unit, has been waived by ***ArrMaz*** by not being raised and addressed by ***ArrMaz*** at this stage of the proceedings....20

IV. The Stipulated Election Agreement between the Union and ***Arr-Maz*** is final and binding.................................................................................21

V. The Stipulated Election Agreement clearly and unambiguously included within the stipulated unit *only* the employees of ***Arr-Maz Products, Limited Partnership***, a/k/a ***ArrMaz Products Inc.***......................................................24

VI. Extrinsic evidence relied on by ***ArrMaz*** does not support its position. .........37

VII. The Stipulation is not void.............................................................38

CONCLUSION .................................................................................39

CERTIFICATE OF COMPLIANCE .......................................................41

ADDENDUM .................................................................................42

CERTIFICATE OF SERVICE....................................................... last page

# TABLE OF AUTHORITIES

## CASES

*ArrMaz Products Inc.*, 372 NLRB No. 12 (2022) ...................................... vi, viii, ix

*Barceloneta Shoe Corp.,* 171 NLRB 1333 (1968) ..................................................21

*Belcher Pharmaceuticals, LLC v. Hospira, Inc.*, 1 F.4th 1374 (11th Cir. 2021).......20

*Breman Steel Co.,* 115 NLRB 247 (1956) ..............................................................21

*Caesar's Tahoe*, 337 NLRB 1096 (2002)................................. 13, 17, 20, 24, 25, 26

*Computer Associates Intern., Inc. v. NLRB,* 282 F.3d 849 (D.C.Cir. 2002) .......21

*Ex-Cell-O Corp.*, 185 NLRB 107 (1970) ...................................................... viii, x, 16

*Gendzier v. Bielecki*, 97 So.2d 604 (Fla. 1957) ........................................ 33, 38, 39

*Hampton Inn & Suites*, 331 NLRB 238 (2000) ................................... 19, 21, 22, 23

*Hayward Convalescent Hospital*, 372 NLRB No. 7 (2022)....................................11

*Kentucky River Medical Center*, 355 NLRB 643 (2010) ........................................11

*Kentucky River Medical Center*, 356 NLRB 6 (2010) ............................................11

*Longmont United Hospital*, 371 NLRB No. 162 (2022) .........................................11

*Masland Industries*, 311 NLRB 184 (1993) ..........................................................32

*NLRB v. O'Daniel Trucking Co.,* 23 F.3d 1144 (7th Cir. 1994)...................... 21, 23

*NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224 (1963) ........................................30

*Ridgewood Health Care Center, Inc. v. National Labor Relations Board*, 8 F.4th 1263 (11th Cir. 2021).................................................................................................18

*Starbucks*, 372 NLRB. No. 10 (2022) ....................................................................11

*Stephens Media, LLC v. NLRB*, 677 F.3d 1241 (D.C.Cir. 2012)....................... vii, xi

*T&L Leasing,* 318 NLRB 324 (1995)......................................................................21

*Viacom Cablevision,* 268 NLRB 633 (1984) ................................................... 24, 34

*White Cloud Prods., Inc.,* 214 NLRB 516 (1974*)* ................................................24

*Wismettac Asian Foods, Inc*, 370 NLRB No. 35 (2020) ........................................25

# INDEX OF ADDENDUM

<u>STATUTES</u>

29 U.S.C. Section 158 .......................................................................... vi, 9

29 U.S.C. Section 159 ................................................................................ vi

29 U.S.C. Section 160 ............................................................... vi, viii, 18

<u>RULES</u>

F.R.C.P., Rule 54 ........................................................................... viii, 15

<u>OTHER AUTHORITIES</u>

Section 11084 of the NLRB Casehandling Manual, Part Two, Representation
Proceedings **Election Agreement: Generally**.....................................................12

Section 11084.1 of the NLRB Casehandling Manual, Part Two, Representation
Proceedings, **Difference Between Consent Election Agreement, Stipulated
Election Agreement and Full Consent Election Agreement** ...........................12

Section 11088 of the NLRB Casehandling Manual, Part Two, Representation
Proceedings, **Parties**.................................................................................13

Section 11090 of the NLRB Casehandling Manual, Part Two, Representation
Proceedings, **Variation Not Permitted** ...............................................................13

Representation-Case Procedures, 84 Fed. Reg. 69524-01 (Dec. 18, 2019) .......... 25

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

To the extent that they are not incompatible with and/or are consistent with this Intervenor Union's Brief and consistent with the proposition that the Board's decision at issue here should be enforced, the Union adopts the briefs yet to be filed by the National Labor Relations Board.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

### A. Jurisdiction of the National Labor Relation Board

The Union concurs with Section A of ArrMaz's Statement of Subject Matter Jurisdiction in that the National Labor Relations Board (NLRB, or Board), pursuant to 29 U.S.C. §§ 159 (Add.0007-09) and 160 (Add. 0010-13) had jurisdiction to certify the Union in NLRB Case 12-RC-255997 as the exclusive bargaining representative of the unit employees at issue, here (R.2053), and, subsequently, following *ArrMaz*'s refusal to recognize said certification and bargain with the Union, also had jurisdiction to enter a remedial order in NLRB Case 12-CA-294086 requiring *ArrMaz* to recognize and bargain with the Union, pursuant to 29 U.S.C. §§158(a)(5) and 160. (Add. 0003 and 0010-13). *ArrMaz Products Inc.*, 372 NLRB No. 12 (2022)(R.2441-52).

### B. This Court's Jurisdiction

Pursuant to 29 U.S.C. §160(e), this Court has jurisdiction to enforce the

Board's order and/or to issue "such temporary relief or restraining order as it deems just and proper…" (Add. 0011-12). *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1249 400 (D.C.Cir. 2012). ***ArrMaz*** has raised the question, however, as to whether the Board's Order, here, is an appealable order.[1/] That issue will be addressed below in Section D of this part.

### C. Timeliness of NLRB's Petition for Review.

On December 6, 2022, the NLRB entered its order in Case 12-CA-294086 granting summary judgment in favor of the NLRB General Counsel, entered the traditional remedial order (Order), and severed for later consideration a remedial policy change requested by the NLRB General Counsel. *ArrMaz Products, supra.* The Board's petition for enforcement of the Order was filed on January 31, 2023. The severed General Counsel request to expand remedies is not before the Court at this time.

---

[1/]The Court in *Stephens Media* stated:

> To be final and, hence, reviewable, an agency action "must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Nat'l Ass'n of Home Builders v. Norton,* 415 F.3d 8, 13 (D.C.Cir.2005) (quoting *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)) (internal quotation marks omitted). The action also "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett,* 520 U.S. at 178, 117 S.Ct. 1154) (internal quotation marks omitted).

*Stephens Media, supra* at 1249.

There are no time limits under 29 U.S.C. §160(e) for the Board to seek enforcement of its Order. (Add.0011-12). Respondent *ArrMaz* timely brought its cross-appeal.

### D. The Appeal is From a Final Order.

*ArrMaz* seeks dismissal and a remand of the Board's Order, claiming that, since the NLRB General Counsel's request for a change in Board policy, which the Board severed for later consideration, precludes this Court from enforcing the Order. That Order fully and finally decided the remaining issues not severed. The Union disagrees.

The Order at issue here was severed by the Board from the NLRB General Counsel's request, that it reverse *Ex-Cell-O Corp*., 185 NLRB 107 (1970), and change its policy, so as to grant "make-whole" relief in certain refusal-to-bargain cases. This "make-whole" policy issue already was pending before the Board in other cases. *ArrMaz, supra* at note 2. Similar to what a federal district court might do pursuant to F.R.C.P., Rule 54(b)( Add. 0014), in entering final judgment on some, but not all claims, allowing those claims to be appealable, "as there is no just reason for delay, the Board similarly severed the "make-whole" policy request for later consideration, so as to "expedite" the resolution of the remaining issues, including granting the traditional remedies:

> In addition, the General Counsel requests that we adopt a compensatory remedy requiring the Respondent to make its employees

whole for the lost opportunity to bargain at the time and in the manner contemplated by the Act. To do so would require overruling *Ex-Cell-O Corp.*, 185 NLRB 107 (1970), and outlining a methodological framework for calculating such a remedy. The Board has decided to ***sever this issue and retain it for further consideration to expedite the issuance of this decision regarding the remaining issues in this case.***[2] See *Longmont United Hospital*, 371 NLRB No. 162, slip op. at 2 (2022). The Board will issue a supplemental decision regarding a make-whole remedy at a later date. See *Kentucky River Medical Center*, 355 NLRB 643, 647 fn. 13 (2010); *Kentucky River Medical Center*, 356 NLRB 6 (2010).

*Arrmaz Products, Inc.*, 372 NLRB No. 12, slip op., p. 2 and note 2 (2022)(emphasis added). Here, the traditional remedies are all *prospective* and, as such, fail to provide any remedies for the *past* three years plus during which ***ArrMaz*** has violated the Act. The Union will not argue, here, why the Board should adopt the "make-whole," or some similar remedy, for ***ArrMaz***'s *past* violations of the Act. However, recognizing the difference between the nature and purpose of the two remedies – the traditional *prospective* remedies versus remedies for the *past* violations – is relevant to the appealability issue.

After severing the request for a policy change, the Board found that ***ArrMaz*** had unlawfully failed and refused to recognize and bargain with the Union, entered the traditional, *prospective* remedies to cease and desist the unlawful actions, bargain on request, and required the posting of appropriate Notices. *Id.* at pp. 2-3. The Board's decision to provide its prospective, traditional remedy to prevent ***ArrMaz*** from *continuing* to violate the Act was final and conclusively established ***ArrMaz***'s

legal obligation to bargain *thereafter*.  Only the severed remedial policy issue for the *past* plus three plus years of violations remain open for consideration.  Significantly, resolution of the *Ex-Cell-O* make-whole issue will have no bearing on the issues already finally decided by the Order.

The Union submits that the Board's Order, as such, is sufficiently final and appealable, so that this Court may exercise its jurisdiction to enforce that Order and/or, in the meantime, grant such temporary relief as it deems just and proper, so as to require ***ArrMaz*** to *hereafter* comply with the Act, as ordered.  ***ArrMaz*** has been determined, as a final matter, to have violated the Act. That liability determination will not change, regardless of any supplemental decision by the Board on the *Ex-Cell-O* issue.  Traditional remedies to address prospective compliance have been ordered and that remedy will not change, regardless of any supplemental decision by the Board on *Ex-Cell-O*.  In other similar cases, where there has not been a request for "make-whole" relief, courts have proceeded to enforce such traditional Board orders, so that the respondent will have a continuing, *future* obligation to comply. The Court should do the same here.

The nature of the requested "make-whole" remedy is significantly different from the traditional remedial Order and, unlike the standard remedies, looks to address the *past* three years plus of ***ArrMaz***'s *past* violations.  Granting, or denying, a new remedy for such *past* violations, whether, or not, the Board (if it should adopt

some sort of "make-whole" relief, whether it applies such new relief retroactively, or not) should not affect the finality of the traditional *prospective* relief that was granted by the Board's Order now pending before the Court.

The Board's Order meets the *Stephens Media* tests: (1) the NLRB's decision is final as to liability and the *future* impact of the Order; and (2) the Order established **ArrMaz**'s obligation to comply with the traditional remedies related thereto.

This Court, then, has and should exercise jurisdiction to consider enforcing the Board's Order, now pending before it. *Id.*

# STATEMENT OF THE ISSUES FOR REVIEW

A. Is the Board's Order sufficiently final regarding its liability and related prospective remedies, so that this Court can enforce the Order and/or, alternatively, grant temporary relief to require *ArrMaz* to recognize and bargain with the Union?

B. Has the Board correctly interpreted and applied the Stipulated Election Agreement between *Arrmaz* and the Union, providing for certain employees of *Arrmaz* to vote in a representation election, thereby effectively excluding employees of a separately-incorporated and unidentified company, *AMP Trucking, Inc*., from being eligible to vote in that representation election?

C. Does *ArrMaz*'s waiver of its challenge to the NLRB Regional Director's finding – that, regardless of the single-employer finding, *AMP* employees do not share a sufficient community of interest with the *ArrMaz* employees to require *AMP* employees placement in the Unit – require dismissal of *ArrMaz*'s petition for review?

# STATEMENT OF THE CASE

## A.    Procedural Background

On February 10, 2020, the Union filed a Petition with Region 12 of the NLRB in Case 12-RC-255997 seeking an election to represent certain employees of an employer named ***Arkema*** at a chemical plant in Mulberry, Florida. (Petition)(R. 1483, 2151).[2] Subsequently, through negotiations between the Union and the "Employer" at the Mulberry facility, the parties entered into a contract, known as a "Stipulated Election Agreement" (Stipulation), that, among other things, governed the election procedure, defined the prospective bargaining unit (Unit), defined those employees eligible to vote, and identified the "Employer," – <u>not</u> as ***Arkema*** – but as – and only as – "***Arr-Maz Products, Limited Partnership***," which is the only part, with the Union, to the Stipulation. This election contract was approved by the NLRB

---

[2] The Union will refer to Bates-stamped pages in the Record filed with the Court by the NLRB (Docket No. 18) and made a part of the Appendix by ArrMaz Products Inc. as "(R. ___)."

Bold italics have been added for clarity to the various company names. Following the representation election, ***Arr-Maz Products, Limited Partnership,*** as stipulated by the parties, changed its name to ***ArrMaz Products Inc***. (R.1549n.1). As such, references, herein, to "***ArrMaz***," unless otherwise noted, or obvious from the context, means both "***Arr-Maz Products, Limited Partnership***" and/or "***ArrMaz Products Inc.,***" since they have been treated as the same employing entity by the parties and Board.

References to the "Brief of Respondent and Cross-Petitioner ArrMaz Products Inc." will be cited as "(ArrMaz Br. at __)."

Regional Director. (R. 1485-88). The Stipulation amended the Petition to conform to the Stipulation. This amendment included changing the identity and name of the employing entity from *Arkema* to *ArrMaz Products Inc*. (R.1485 ¶1). There was no mention of another, separately-incorporated company, *AMP Trucking Co. Inc*. (*AMP*), in either the Petition, originally, or as amended, or in the Stipulation. (R. 1483, 1485-88).

Contrary to *ArrMaz's* contention (ArrMaz Brief at 2), the Stipulation and amended Petition specifically define "Employer." In fact, there is only one named company referenced in the Stipulation and only in two places: *Arr-Maz Products, Limited Partnership*. The limited partnership is specifically named, or referenced: (1) in the name of the case (R. 1485); and (2) the company name, *Arr-Maz Products, Limited Partnership*, is typed-in over the line on the signature page under which is typed the word, "(Employer)." (R. 1488). The Stipulation references no other company, such as *AMP Trucking, Inc. (AMP)*, by name. (R. 1485-88). *ArrMaz* has not cited any credible evidence that, prior to entering into the Stipulation, the parties discussed *AMP*, or its employees, as being part of the Stipulation, the Employer, or the stipulated Unit![3/]

_____

[3/]The Union representative (now deceased), Tommy Summerlin, who negotiated and signed the Stipulation, testified that the Union did not intend to include the two challenged *AMP* voters as part of the Stipulation. (While he testified from Petitioner

Footnote continued on next page.

Pursuant to the Stipulation, a representation election was held for the stipulated Unit on March 12-13, 2020 (R. 1550). The Union timely objected to the counting of the ballots of two (2) *AMP* employees, Jesse Hargadine and Robert Strickland, since they were not employed by the Employer named in the Stipulation, *Arr-Maz Products, Limited Partnership*. *ArrMaz*, however, contended that Hargadine and Strickland were eligible to vote and that, since their two votes could be outcome determinative, they should be counted. The two challenged ballots were sealed and remain uncounted.

Despite the Stipulation making no reference to employees of a different company, *ArrMaz* took the matter to five days of hearing on the two challenged ballots (and other related) issues. The hearings were held before a Hearing Officer of NLRB Region 12 on September 24 and September 28 through October 1, 2020. The Hearing Officer's 29-page Report on Challenged Ballots, which was issued on January 29, 2021, acknowledged a stipulated change in the Employer's name. (R. 1549n.1, 1577)(HOR).[4/]

---

Exhibit 1, that exhibit was withdrawn, since it already was part of the Board's official papers. (R.82, 89-90). The Stipulation, itself, supports Summerlin's testimony.

[4/]At the outset of that hearing, "the Employer represented that its legal name recently had changed from *Arr-Maz Products, Limited Partnership* to *ArrMaz Products Inc*." The parties stipulated to the change in the Employer's name. The Hearing

Footnote continued on next page.

There were no stipulations at the Hearing, that ***AMP*** was included as part of the term, "Employer," in the Stipulation.[5/] (R. 1518, 1549-1577).

The NLRB Hearing Officer and, later, the NLRB Regional Director in his 38-page decision (R.1619-56) upheld the Union's objection to opening and counting the ***AMP*** employees' ballots, finding that the Stipulation was not ambiguous on the matter, and holding that "[Jesse] Hargadine and [Robert] Strickland are not eligible to vote [in the representation election] because they are not employed by the employer named in the Stipulated Election Agreement, but by ***AMP***." (R. 1549,1577,1622,1655)(bracketed material added). Both the Hearing Officer and the Regional Director, alternatively, also found that, even if they were to consider ***AMP*** and ***ArrMaz*** to be a single employer, they found that the two ***AMP*** employees did not share a sufficient community of interest with those ***ArrMaz*** employees in the stipulated Unit and, as such, the two ***AMP*** employees properly were excluded from voting, so their ballots would not be opened and cast. (R. 1575-77,1622,1655).

---

Officer took administrative notice that this name change likely occurred on July 21, 2020, which was after the March 12-13, 2020, election. (R. 1549n.1). The change from a limited partnership to a corporation was not addressed.

[5/]Apparently, there are several, related companies that include the name "***Arkema***," according to ***ArrMaz***'s corporate disclosure statement. Which "***Arkema***" was being referenced by the Union in its Petition became irrelevant, when the Petition was amended by the Stipulation to remove "***Arkema***" and, instead, replace that company with ***Arr-Maz Products, Limited Partnership*** as the "Employer."

No evidence has been cited by ***ArrMaz***, that it informed the Union, ***prior to entering into, or at the time of, the Stipulation***, that it was, or would be, contending that ***AMP*** employees, Hargadine and Strickland, effectively were employees of the Employer, ***Arr-Maz Products, Limited Partnership,*** under a single-employer theory and, as such, were intended by ***ArrMaz*** to be included in the stipulated unit. ***Only after*** entering into the Stipulation did ***ArrMaz*** make such a contention and/or provide such evidence. Further, ***only after*** entering into the Stipulation did ***ArrMaz*** raise its contention that ***ArrMaz*** (under whatever name), and ***AMP*** constituted a "single employer" and that the two ***AMP*** employees shared a sufficient community of interest with the ***ArrMaz*** employees, so that they *had to be included* within the previously-stipulated, petitioned-for unit.

The Union will address below ***ArrMaz***'s arguments that the Union *intended* to include the two ***AMP*** employees, when it entered into the Stipulation.[6] Suffice

---

[6]/***ArrMaz*** contended that the Union knew it wanted to include Strickland and Hargadene in the Unit, since they were listed on their voting list. ***ArrMaz*** complained that the Board did not include in the submitted Record the voter list purportedly prepared and submitted by ***ArrMaz*** to the Union two (2) business days *after* the parties entered into the Stipulation. (ArrMaz Br. at p.3n3). Yet, ***ArrMaz*** objected to the inclusion of this exhibit at the September-October, 2020, hearing. While HR Manager Patricia Arscott, who signed the Stipulation, initially identified the 2020 voter list (R.1105), she backed off somewhat with assistance by ***ArrMaz***'s counsel (R.1105-06), when Union counsel noted that the list failed to contain all of the required information, such as job classifications. (R. 1105). In part, this explains why there is no voter list in the Board's Record. (R. 578-84).

Footnote continued on next page.

to say at this point, there is no credible evidence that the Union intended any such thing.[7]

Further, all of *ArrMaz*'s purported evidence as to any single-employer relationship between *ArrMaz* and *AMP*, or the alleged interrelationships on which *ArrMaz* relies to support its community-of-interest arguments, are based on evidence, most of which, including the voter list, was divulged *after* the Stipulation was reached. *ArrMaz* fails to show, or even argue, that the Union was aware, or fully aware, of such evidence at the time it entered into the Stipulation. Ascertaining the Union's intent, when it entered into the Stipulation, cannot be done through information the Union might have become aware post-Stipulation. Lacking evidence of the Union's intent, *ArrMaz* turns to speculating that there was no

---

Nevertheless, the Regional Director took administrative notice that Strickland was not on the Employer's voter list in 2015, in an earlier stipulated election (that did not occur), where the 2015 unit description was identical to the 2020 unit description. (R.1642-43).

*ArrMaz* contends that the Union waived its challenges, because it did not timely object to the inclusion of the *AMP* employees on the 2020 voting list. (ArrMaz Br. at p.31). That waiver argument was not raised by *ArrMaz* in its brief to the Hearing Officer, though it was raised later with the Regional Director, who rejected *ArrMaz*'s argument, since the Union did timely raise its challenge. (R.1501-1537, 1583, 1637).

[7]The evidence is to the contrary. (R. 83).

meeting of the minds, suggesting a lack of mutual intent based on pure speculation.[8/]

Following issuance of the Hearing Officer's Report finding that the Stipulation was clear and unambiguous and was not intended to include the two (2) *AMP* employees in the stipulated unit, nor include them as eligible voters, nor did they share a community of interest with the ***ArrMaz*** employees, ***ArrMaz*** filed and fully briefed its exceptions with the NLRB Regional Director. On August 25, 2021, almost a year and a half after the election, the Regional Director issued his 38-page decision (R. 1619-56). He sustained the Hearing Officer, finding that the Stipulation was clear and unambiguous and was not intended to include the ***AMP*** employees in the unit, rejected opening and counting the ***AMP*** employees' votes in the vote tally, and certified the Union as the exclusive bargaining representative. (R.1788-89). He also held alternatively, that the ***AMP*** employees did not share a community of interest with the ***ArrMaz*** employees. (R. 1622,1655).

---

[8/] In support of its belated claim, that the Stipulation is void due to no meeting of the minds on the parties' intent, ***ArrMaz*** speculates – without citing *any* evidence – about how the Stipulation was reached between the parties, suggesting miscommunications. (ArrMaz Br. at pp.34-36)(Doc. 24-1, pp.49-51). The Court should disregard these unsupported speculations.

Nevertheless, the important fact, here, is that, **at the time the Union entered into the Stipulation**, there is no evidence that ***ArrMaz*** would, later, contend that two ***AMP*** employees should be considered employed *in the stipulated unit* by ***Arr-Maz Products, Limited Partnership***, and, as such, be considered eligible voters.

Thereafter, *ArrMaz* filed a request for review of the Regional Director's decision with the NLRB. (R. 1657-94). On February 17, 2022, the NLRB, in a unanimous 3-0 decision by Chairman McFerran and Members Kaplan and Ring, denied *ArrMaz*'s request. (R. 2053). Significantly, the unanimous Board noted that:

> …the stipulated election agreement expressed the parties' intent in clear and unambiguous terms to exclude the two challenged employees.

(R. 2053n.1).

Shortly thereafter, the Union, now the certified exclusive bargaining agent for the *ArrMaz* unit employees, demanded that *ArrMaz* bargain with it. *ArrMaz* refused to recognize and bargain with the Union, apparently on the basis that the NLRB allegedly improperly sustained the Union's objection and excluded the *AMP* employees' ballots in the vote tally. The Union, then, filed an unfair labor practice charge (Charge) alleging that such refusals violated Sections 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C.§§158(a)(1) and (5). (Add.0001-03).

NLRB Region 12, following investigation of the Charge, issued a Complaint, subsequently amending it. (R.2055-69, 2077-82). *ArrMaz* admitted its refusal to recognize and bargain with the Union, but claimed the Union's certification was defective due to the failure to count the two *AMP* ballots. (R. 2087-90).

Counsel for the NLRB General Counsel then filed a motion for summary judgment with the Board, seeking a finding that *ArrMaz* had violated the Act, as alleged, and she requested the traditional remedies in what has become known as a

"test of certification," or "test of cert" case. (R. 2092-2150). The traditional remedies only address an employer's prospective actions and do not address the prior harm to employees, who, effectively, have lost their certified right to representation (here, now, for more than 3 years since the March, 2020, election). She also sought a change in Board policy to address the employees' past lost opportunity to bargain for working-condition changes, opportunities to negotiate for changes in those conditions, and the lost representational opportunities concerning such matters as discipline, job modifications, wage and benefit changes, etc.

On December 6, 2022, the Board issued its decision, *ArrMaz Products Inc*., 372 NLRB No. 12 (2022)(R.2441-52). The Board found that **ArrMaz** violated the Act, as alleged, by not recognizing the certification and by not bargaining with the Union; issued the traditional remedies, including a cease and desist order, and ordered **ArrMaz** to bargain and post an appropriate notice. However, as to the General Counsel's request for a new "make whole" remedy to address **ArrMaz**'s past refusal to bargain, the Board severed that request, stating:

> In addition, the General Counsel requests that we adopt a compensatory remedy requiring the Respondent to make its employees whole for the lost opportunity to bargain at the time and in the manner contemplated by the Act. To do so would require overruling *Ex-Cell-O Corp.*, 185 NLRB 107 (1970), and outlining a methodological frame- work for calculating such a remedy. The Board has decided to sever this issue and retain it for further consideration to expedite the issuance of this decision regarding the remaining issues in this case.[2] See *Longmont*

*United Hospital*, 371 NLRB No. 162, slip op. at 2 (2022).  The Board will issue a supplemental decision regarding a make-whole remedy at a later date.  See *Kentucky River* 643, 647 fn. 13 (2010); *Kentucky River Medical Center*, 356 NLRB 6 (2010).

[2]The merits of the severed and retained issue, along with the Respondent's request that the Board seek public input as to those merits, are now pending at the Board.  Accordingly, addressing our dissenting colleague's arguments on the merits of the issue would be premature, and we decline to do so.

(R.2442).[9]

Thereafter, the Board sought enforcement of its Order by this Court.  ***ArrMaz***, then timely filed a cross-petition seeking to vacate and/or remand the matter to the Board.  The Union was permitted to intervene on behalf of the Board.

## B. Statement of Facts

In an effort to be obtain certification from the National Labor Relations Board as the exclusive bargaining representative for a certain group of employees at a chemical plant in Mulberry, Florida, the Union filed a Petition with Region 12 of the Board.  In its Petition, the Union described the employee group for which it was

---

[9]The Board has taken a similar position in prior unrelated, as well as other recent similar, cases, where it has severed a similar request for a "make whole" remedy, or when considering to change its policy and, thereafter, routinely order compound interest on back pay awards. *See, e.g., Longmont United Hospital*, 371 NLRB No. 162, slip op., p.2 (2022); *Hayward Convalescent Hospital*, 372 NLRB No. 7, slip op., p. 2 (2022); *Starbucks*, 372 NLRB. No. 10, slip op., p. 2 (2022); *Kentucky River Medical Center*, 355 NLRB 643, 647n.13 (2010)(severing issue of whether to grant compound interest routinely for later consideration); *Kentucky River Medical Center*, 356 NLRB 6 (2010).

seeking representation through generic job references.  The Union sought to include certain employees in, while excluding other employees from, the proposed, petitioned-for group of employees, referred to as a "unit."  Among other things, the Union generically identified the employer of the unit employees as "*Arkema*" and sought a manual, in-person election.  (R. 1483).

The Board provides several methods by which certification can be obtained.[10] When there are disagreements over matters presented by the Petition, the NLRB Regional Director (RD) may appoint a hearing officer to consider evidence and make recommendations to the RD, who will resolve the factual and legal issues and make a decision on the disputed matters.  However, the parties, alternatively, may negotiate a contract, known as a stipulated election agreement, to guide the election. *Id.*  When the parties stipulate to an election, describing the unit therein, the Board's policy is to honor the stipulated unit, even if, had the matter been litigated the Board would have decided the unit-issue differently and, even if the stipulated unit

---

[10] *See, e.g.*, Sections 11084 of the NLRB Casehandling Manual, Part Two, Representation Proceedings, **Election Agreement: Generally**, (Add.0016-17) and Section 11084.1, **Difference Between Consent Election Agreement, Stipulated Election Agreement and Full Consent Election Agreement.**  (Add.0017-18)

otherwise would not be found to be "appropriate," so long as the stipulated unit does not violate the National Labor Relations Act, or Board policy.[11]

In this case, the parties entered into such a Stipulation with the RD's approval. (R. 1485-87, 1488). Among other things, the Stipulation described the unit (Unit) in more detail, established the election date and guidelines, while the parties to the Stipulation identified themselves, effectively describing, who they meant by reference to the term, "Employer," in the Stipulation. The name of the case became *ArrMaz Products, Limited* <u>not</u> "*Arkema*." The parties identified the "Employer," not by reference to "*Arkema*," as in the Petition (which was amended by the Stipulation to, effectively, remove *Arkema* as the employer)(R. 1483, 1485-88, 1636-37), but described and identified the "Employer" solely as the limited partnership, *ArrMaz Products, Limited Partnership*.[12] There are no references in the Stipulation to a corporation, or to *AMP Trucking, Inc*., as being part of the

---

[11] *See, e.g.,* Section 11090 of the NLRB Casehandling Manual, Part Two, Representation Proceedings, **Variation Not Permitted**: "Unless there are exceptional circumstances, the language of the printed agreement constitutes the only terms under which agreed upon elections may be held." (Add. 0019). *See also*, *Caesar's Tahoe*, 337 NLRB 1096, 1097-98 (2002). Further, Section 11088, **Parties**, states that the "[n]ecessary parties to an election agreement are the employer and union." (Add. 0019).

[12] In its corporate disclosure statement in its brief to this Court, *ArrMaz* listed multiple related companies that include the name, "*Arkema*" though, curiously, it did not identify *AMP Trucking, Inc.* in its disclosure. No evidence has been presented that the Union was aware of the various corporate interrelationships, or the extent thereof, at the time it entered into the Stipulation.

"Employer" of the potential unit employees.  In addition to the Stipulation itself, there is evidence that the Union, when it entered into the Stipulation, did not intend to include employees of ***AMP Trucking, Inc***. (R. 83, lines 15-16).

Two business days following execution of the Stipulation, ***ArrMaz*** provided the Union with an employee list.  Apparently for the first time, the Union became aware that ***ArrMaz*** was contending that two ***AMP*** employees should be permitted to vote in the election.  When the two listed ***AMP*** employees later attempted to cast a ballot in the election, the Union timely challenged those votes, which were and remain impounded.  Their ballots ended up becoming outcome determinative, when the vote tally showed that the Union won by two votes, since, if the Challenged ballots were opened and both voted against the Union, it would be a tie, and the Union loses on a tie.  (R. 1492).

The RD appointed a Hearing Officer to hear evidence and make recommendations regarding the Challenged ballots.  Apparently for the first time, ***ArrMaz*** also claimed that a separately incorporated company, ***AMP***, also was part of the employing entity, under the single-employer doctrine.  Following the hearing and filing of post-hearing briefs by the Union and ***ArrMaz***, the Hearing Officer made her recommendations to the RD.  (R. 1549-1577).  Since ***ArrMaz*** disagreed with those recommendations, it filed 10 exceptions with the RD.  (R. 1580-1606).

In a 38-page well-reasoned decision, the RD found that, while *AMP* and *ArrMaz* are a single employer, the Stipulation did not include employees of *AMP* as part of the potential Unit. The RD also, alternatively, found that, nevertheless, the *AMP* and *ArrMaz* employees do *not* share a sufficient community of interests to require the inclusion of both in the same unit. (R. 1622, 1653-55). *ArrMaz* at this stage of the proceedings has *not* challenged in its brief the RD's finding that, even a part from the Stipulation, the *AMP* employees do *not* share a community of interest with the *ArrMaz* employees. (ArrMaz Br. at 14n.5). Instead, *ArrMaz* argues that the parties to the Stipulation intended to include *AMP* within the definition of "Employer." In an argument not raised below, *ArrMaz*, alternatively, argues that there was no meeting of the minds of what was meant by "Employer" in the Stipulation and, thus, the Stipulation is void and not enforceable, at least not on that issue. (ArrMaz Br. at pp. 49-51).

Because *ArrMaz* continues to refuse to recognize and abide by the Board's certification, the Union filed an unfair labor practice, which, ultimately, resulted in the Board's bargaining and remedial Order, that is at issue here.

## SUMMARY OF ARGUMENT

The Board's severance of the NLRB General Counsel's request – that the Board overrule *Ex-Cell-O* and to adopt a new policy to grant a "make-whole" remedy for an employer's **past** unlawful refusal to recognize and bargain with a newly-certified union – does not preclude this Court from enforcing the Board's findings and traditional remedies in this case, since that Order only addresses the employer's **future** compliance with the NLRA. The Board's severance of the *Ex-Cell-O* "make-whole" remedy issue was, as it stated, "to expedite issuance" of its bargaining order with traditional remedies. The Board's approach is akin to a district court directing final judgment on some, but not all claims, "when the court expressly determines that there is no just reason for delay," pursuant to F.R.C.P. Rule 54(b). (Add. 0014). Essentially, the Board has found there is no just reason for delay here.

The Board's Order resolves with finality the issue of whether *ArrMaz* violated the NLRA. The Order, as severed from the *Ex-Cell-O* issues resolves, with finality, the prospective remedy issues. The Order is enforceable now.

*ArrMaz* has only challenged, here, the RD's decision excluding the Challenged ballots based on the RD's and Board's interpretation and application *of the Stipulation*. *ArrMaz* has <u>not</u> challenged at this stage of the proceedings the NLRB RD's decision that, regardless of whether he was correct in his interpretation and application *of the Stipulation*, the RD still was excluding the Challenged ballots

based, alternatively, on his application of traditional community-of-interest considerations. *ArrMaz* contended that, either through the application of the first or second-steps in the analysis of the three-step approach for deciding Challenged ballots, there was no need to go to the third-step (probably because *ArrMaz* knew it still would lose at the third step). The RD proceeded to apply the third-step in the event that the Board did not agree with his interpretation and application of the Stipulation, using the first and second-steps of the analyses. Under the third step, if the RD is unable, through either objective, or subjective, evidence, to determine whether the disputed employees should, or should not, be included within the potential unit, he applies the traditional community-of-interest analysis. *Caesar's Tahoe, supra*.

The RD's alternative third-step analysis resulted in the exclusion of the challenged ballots, regardless of whether *AMP* and *ArrMaz* should be treated as both part of the "Employer." The RD found that, since there is not a sufficient community of interest between the employees of the two differently-incorporated companies to require the inclusion of the *AMP* employees in the *ArrMaz* unit, the AMP employees were not entitled to vote in the election. (R.1622,1655).

Since *ArrMaz* has failed to preserve any challenge to the RD's community-of-interest findings – the Board did not address the RD's community-of-interest findings -- that are based on a third-step analysis (as opposed to just an interpretation

of the Stipulation), it has waived that challenge.  This, alone, is a basis to sustain the Board's Order, albeit on an alternative basis.

Further, the Board correctly determined that the Stipulation clearly and unambiguously excluded *AMP* employees from the *ArrMaz* unit.

## LAW AND ARGUMENT

### I.   Standard of Review

The Court must accept the Board's findings of fact, if supported by substantial evidence:

> The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.

29 U.S.C. §160. (Add. 0010-13).  Additionally, this Court has held:

> We review the Board's legal conclusions *de novo* and its findings of fact for substantial evidence. *Mercedes-Benz U.S. Int'l, Inc. v. Int'l Union, UAW*, 838 F.3d 1128, 1134 (11th Cir. 2016).

*Ridgewood Health Care Center, Inc. v. National Labor Relations Board*, 8 F.4th 1263, 1274 (11th Cir. 2021).

### II.   The NLRB's Order, that resolved the remaining issues, finally, left after the *Ex-Cell-O* issue was severed, is enforceable.

Despite the parties having entered into the Stipulation – an "expeditious" procedure provided by the Board to streamline the representation election

procedure[13] – *ArrMaz* has used almost every tool in its toolbox to continue delaying complying with its legal obligation to recognize and bargain with the Union. Even though the Stipulation clearly and unambiguously excluded all employers of companies other than the party to the Stipulation, *ArrMaz* forced five (5) days of hearing over the two challenged ballots. *ArrMaz* forced briefing before the Hearing Officer, the Regional Director, and the Board, and, now, this Court, where it even raises issues not raised below, rather than complying with its legal obligations! *See*, *e.g.,* Section VII of Law and Argument, *infra*. Now, *ArrMaz* seeks a substantial further delay in enforcing the Union's rights, claiming there is no final order. Justice, however, delayed, is justice denied.

The Union addressed *ArrMaz*'s final-appealable-order argument above in the Statement of Subject Matter and Appellate Jurisdiction, Section D, of this Brief, which is incorporated herein by reference. As analyzed there, the Union submits that the challenged Order is appealable and this Court can and should address and enforce the Order, promptly, without further delay and/or grant temporary relief pending further litigation. Otherwise, justice further delayed is justice undeniably denied (particularly if the Board does not grant a remedy for ArrMaz's past three years plus denial of the Union's and the employees' rights).

---

[13] *Hampton Inn, supra* at 238-39.

## III. Any challenge to the RD's finding, that, alternatively, the *AMP* employees do not have a sufficient community-of-interest with the *ArrMaz* employees, so as to require their inclusion in the *ArrMaz* unit, has been waived by *ArrMaz* by not being raised and addressed by *ArrMaz* at this stage of the proceedings.

If the Board cannot determine, whether a disputed employee, or classification, was intended to be included (or excluded) by the parties to a stipulated election agreement, through either objective evidence (first step), or subjective evidence (second step), the Board then proceeds to the third-step in the analysis, *i.e.,* apply the traditional community-of-interest doctrine. *Caesar's Tahoe*, 337 NLRB 1096, 1097 (2002). Here, as an alternative finding, the RD proceeded to that third-step and found that there was not a sufficient community-of-interest between the *AMP* and *ArrMaz* employees, so as to require the inclusion of the *AMP* employees in the *ArrMaz* unit. (R. 1622, 1655). As such, the *AMP* employees *still* were not eligible to vote, despite the single-employer finding.

Thus, *ArrMaz* has not preserved at this stage any challenge to the RD's community-of-interest holding. *ArrMaz* even urges this Court <u>not</u> to proceed to address the RD's alternative, third-step community-of-interest finding. (ArrMaz Br. at p. 14n. 5). On that alternative basis, alone, the Board's Order should be sustained and enforced. *Cf., Belcher Pharmaceuticals, LLC v. Hospira, Inc.*, 1 F.4th 1374, 1379 (11th Cir. 2021)(Court of Appeals may affirm district court "on any basis the

record supports," regardless of whether that basis was "addressed, adopted, or rejected by the district court.").

## IV. __The Stipulated Election Agreement between the Union and *Arr-Maz* is final and binding.__

The Board has long held that election agreements are "contracts," binding on the parties that executed them. *NLRB v. O'Daniel Trucking Co.,* 23 F.3d 1144, 1148-49 (7th Cir. 1994); *T&L Leasing,* 318 NLRB 324, 326n.13 (1995); *Barceloneta Shoe Corp.,* 171 NLRB 1333, 1343 (1968); *Breman Steel Co.,* 115 NLRB 247, 249-50 (1956). Parties to t h e Stipulation are bound to that agreement absent a demonstration of unusual circumstances. *Computer Associates Intern., Inc. v. NLRB,* 282 F.3d 849, 852 (D.C.Cir. 2002). The Board normally does not permit an employer, absent unusual circumstances, to disregard, or withdraw from, its stipulated election agreement, nor does it matter that, if litigated, rather than stipulated, the Board may have reached a different conclusion on the unit description. *Hampton Inn & Suites*, 331 NLRB 238-39 (2000)(emphasis added):

> It is well established that once an election agreement has been approved, a party may withdraw therefrom only upon an affirmative showing of unusual circumstances or by agreement of the parties. *Sunnyvale Medical Center*, 241 NLRB 1156 (1979); *Unifemme, Inc.*, 226 NLRB 607 (1976). Although the Employer contends that the stipulated unit shares a community of interest with those employees whom Petitioner seeks to include in the second petition, it is ***the Board's practice to honor concessions made in the interest of expeditious handling of representation cases, even if the Board may have reached a different result upon litigation***. *Highlands Regional Medical Center*, 327 NLRB 1049 (1999). Thus, ***the question as to***

> *whether the stipulated unit shares a sufficient community of interest with the employees sought in the second petition, or whether the Board would include or combine them in one unit upon litigation, are issues not relevant to determining whether the Stipulated Election Agreement should be enforced*. Highlands Regional Medical Center, supra.

The Board went on in *Hampton Inn* to emphasize that, even if it had found the stipulated unit to be inappropriate if the matter been litigated, rather than stipulated, it still will honor the parties' stipulation, so long as it does not contravene statutory provisions, or the Board's policies:

> Nevertheless, the Employer decided, in the interest of **expeditious handling** of a representation case, to concede the appropriateness of the unit, and it is the Board's practice to **honor that concession, even though the Board may have reached a different result upon litigation**. *Highlands Regional Medical Center*, supra. The Board has long held **that a stipulated unit will not be cast aside solely because it designates a unit we might find inappropriate had resolution of the issue not been agreed upon by the parties.** *Otis Hospital*, 219 NLRB 164, 165 (1975); *The Leonard Hospital*, 220 NLRB 1042 (1975). Thus, **even assuming that the stipulated unit is an inappropriate one, we will give full force and effect to that stipulation, provided that it does not contravene the provisions of the Act or established Board policy**. Inasmuch as the Employer has not shown that the stipulated unit contravenes statutory or established Board policy, we shall hold the Employer to its stipulation.

*Hampton Inn, supra* (emphasis added). ***ArrMaz*** failed to demonstrate, or even assert, that any substantive changes, or unusual circumstances, have occurred since execution of the Stipulation, nor has ***ArrMaz*** claimed that the Stipulation violates any statutory, or Board policy. Therefore, the Stipulation remains final and binding on the parties. Thus, the Board must interpret and apply that Stipulation.

If the Stipulation is clear and unambiguous – as both parties claim, but for different reasons – the issue of the appropriateness of the stipulated unit is not subject to the community-of-interest analysis, as even *ArrMaz* recognizes. (ArrMaz Br. at p. 14n.5). Courts agree. *See, e.g., NLRB v. O'Daniel Trucking Co.*, 23 F.3d 1144, 1149 (7th Cir. 1994). Consequently, if the Stipulation is clear and unambiguous – as the Board correctly found – this Court need not proceed to a community-of-interest analysis (though such an analysis still supports the Board's Order excluding the challenged *AMP* ballots).

That leaves the Court with this question: *Should the Board's finding be sustained that "the stipulated election agreement expressed the parties' intent in clear and unambiguous terms to exclude the two challenged employees?"* The Union submits that, whether as a *de novo* interpretation of the Stipulation by this Court, or by this Court's giving deference to the Board's substantially-supported factual interpretation of the Stipulation, the Board's Order should be sustained.

If the Court finds that the Stipulation should be interpreted, as the Board has interpreted it, the case should end there. It does not matter that the Board, if litigated, may have found a different unit appropriate, including employees of *AMP*, or required the inclusion of the two challenged *AMP* employees in the unit, nor does it matter that the unit, if litigated, would not have been found appropriate. *Hampton Inn, supra.*

## V. The Stipulated Election Agreement clearly and unambiguously included within the stipulated unit *only* the employees of *Arr-Maz Products, Limited Partnership,* a/k/a *ArrMaz Products Inc.*

In stipulated unit cases, "the Board's function is to ascertain the parties' intent with regard to the disputed employee and then to determine whether such intent is inconsistent with any statutory provision, or established Board policy." *White Cloud Prods., Inc.,* 214 NLRB 516 (1974*), quoting, Tribune Company*, 190 NLRB 398 (1971). "The Board examines the intent on an objective basis, and it denies recognition to any subjective intent at odds with the stipulation." *Viacom Cablevision,* 268 NLRB 633 (1984).

Challenged ballots in disputed elections conducted pursuant to a stipulated election agreement are evaluated under the three-step test set forth in *Caesars Tahoe,* 337 NLRB 1096, 1097 (2002). Under this test, the Board first decides whether the stipulation is ambiguous regarding the inclusion, or exclusion, of the challenged voters. If the objective intent is clear, the Board will hold the parties to their stipulated agreement, just as with any other type of contract. In determining whether a stipulated agreement is unambiguous, the Board recognizes that a simple reference to "employer" in such agreements, absent more, normally means  -- and should mean -- the company that is a party to that stipulated agreement:

> Consistent with the fact that the parties should reasonably understand any reference to "employer" in an election agreement to refer to the employer who is a party to the agreement, we will no longer construe

"nonsupervisory-employee" to include employees who are employed by some ***other*** employer.

Representation-Case Procedures, 84 Fed. Reg. 69524-01 (Dec. 18, 2019)(emphasis added)(Add. 0020-21). Here, ***AMP*** is not a party to the Stipulation!

If the Stipulation parties' intention regarding the Unit issue cannot be determined through objective evidence, the Board will proceed to the second-step of the analysis and attempt to determine the parties' intent through normal methods of contract interpretation, including the examination of extrinsic evidence. If the parties' intent *still* cannot be discerned, the Board, *only* then, turns to the third-step of the analysis, applying the community-of-interest doctrine to resolve the challenged voters' unit inclusion, or exclusion. *Caesars Tahoe,* 337 NLRB 1096, 1097 (2002), *citing, Associated Milk Producers, Inc. v. NLRB*, 193 F.3d 539 (D.C.Cir. 1999); *see also, Wismettac Asian Foods, Inc*, 370 NLRB No. 35, slip op., p. 32 (2020).

***ArrMaz*** is correct, then, that, under the NLRB's traditional three-step analysis in situations, such as this one, if the stipulated election agreement is clear and unambiguous after applying the step one analysis, the analysis stops there. The Stipulation is enforced.

If extrinsic evidence is necessary to determine the parties' intent, when the Stipulation is ambiguous, the Board will proceed to the second-step analysis. After applying the step two analysis using contract-interpretation principles and possibly

considering extrinsic evidence, if the parties' intention, then, becomes clear, the Stipulation, as interpreted, is applied and the analysis stops there.

Only when, after the first and second-step analyses fail to establish the parties' intention, will the Board proceed to apply the community-of-interest standard to ascertain whether the challenged employees should be in or out of the unit. *Caesars Tahoe, supra*.

Here, as *ArrMaz* has recognized, there is no need to proceed to the third-step community-of-interest analysis, since the Board -- correctly in the Union's view – was able to determine the parties' intentions by applying the step-one, or step-two, analysis, given that the Stipulation is clear and unambiguous, or can be determined to be clear through extrinsic evidence.

The Union agrees that the Stipulation is not ambiguous, but not as *ArrMaz now* suggests.[14/] Instead, the Stipulation – as the Hearing Officer, the Regional

---

[14/]Apparently, *ArrMaz* cannot decide whether the Stipulation is, or is not, objectively unambiguous. Unlike now, in its Exception No. 2 of its "Employer's Exception to the Hearing Officer Recommended Decision on Challenged Ballots," *ArrMaz* argued, then:

> The 2020 Stipulated Election Agreement (the "2020 Agreement") (Board Exh. 1(a)) neither expressly includes nor expressly excludes AMP Trucking ("AMP") when referring to "Employer" in establishing the bargaining unit. That alone is sufficient reason to conclude the 2020 Agreement is ambiguous. *See, Caesar's Tahoe*, 337 NLRB at 1098 ("[C]ontrary to the hearing officer, we do not believe that the parties'

Footnote continued on next page.

Director, and the Board, all have correctly recognized – objectively excluded employees of all *other* companies (which were not parties to the Stipulation).  ***AMP*** was not a party to the Stipulation.  Case over!

***ArrMaz*** is incorrect, when it claims that the Stipulation clearly and unambiguously was intended to include the two challenged ***AMP*** employees, a separately-incorporated and differently-named company, ***AMP***, a company that is not even mentioned in the Stipulation!  There simply is nothing within the four-corners of the Stipulation suggesting that the Union, let alone both parties *at the time they entered into the Stipulation* – the critical time period – ever communicated with each other, or ever *mutually* intended, or agreed, that just two, but not all, of the employees of another, different, ***unnamed*** company – ***AMP*** – would, or should, be included within the stipulated unit with ***ArrMaz*** employees.

Rather than the Stipulation clearly and unambiguously including the two disputed ***AMP*** employees, the Union submits the Stipulation, itself, clearly and unambiguously <u>excludes</u> not only ***AMP*** employees from the stipulated ***ArrMaz*** unit, but also excludes the employees of every other company in the World from that unit, who are not employed by a party to the Stipulation.

---

intent here can be determined from the language of the stipulation.  This stipulation neither specifically includes nor specifically  excludes  the Engineering Coordinator position.").

(R. 1583).  Unlike ***ArrMaz,*** the Union has been consistent: The Stipulation is clear and unambiguous and it excludes the ***AMP*** employees.

On what basis, then, does *ArrMaz* now argue that the Stipulation is unambiguous?  *ArrMaz* argues, for instance, that the parties' mutual intention can be gleaned from the four-corners of the Stipulation based in part on the stipulated Commerce Clause.  The inclusion of such a clause is necessary, since the validity of the National Labor Relations Act is based on Congress authority, under the Commerce Clause of the U.S. Constitution, to regulate Commerce.  Such "commerce" language in Board decisions, or stipulated election agreements, is pretty much boiler-plate, in order to establish that the Board has jurisdiction over the employer and matter.  (R. 12-13).

So, why does *ArrMaz* claim that this Clause reflects the parties' mutual intention to include *AMP* employees in the unit?  It does so by misinterpreting, misapplying, and stretching just two words in that Clause way beyond any purpose for which they were included in the Stipulation.

The mere two words in the Paragraph 2, Stipulated Commerce provision on which *ArrMaz* relies – "providing" and "received" – are highlighted below:

> **2.  COMMERCE.**  The Employer is engaged in commerce within the meaning of Section 2(6) and (7) of the National Labor Relations Act and a question ***affecting commerce*** has arisen concerning the representation of employees within the meaning of Section 9(c).
>
> Arr-Maz Products, Limited Partnership is a Delaware limited partnership with an office and place of business located at 4800 State Road 60 E, Mulberry, Florida, and is engaged in the business of manufacturing ***and providing*** specialty chemical additives to the fertilizer manufacturing, mining, and asphalt paving industries.

During the past 12-month period, in conducting these business operations described above, the Employer purchased **and received** at its Florida facilities goods valued in excess of $50,000 directly from points located outside the State of Florida.

(R. 1485). **ArrMaz** argues that, since **AMP** is *providing* transportation of **ArrMaz** goods out of its facility and it has *received* products brought in by **AMP**, this somehow evidences an intent by the parties to include **AMP** employees in the stipulated unit. But to draw such a conclusion, without more, is not only unwarranted and a real stretch, one also would have to establish that **ArrMaz**, in order to meet the "affecting commerce" test, would, *itself*, have to do the transporting of product, in and out, of its plant. **ArrMaz** essentially argues that it does handle its own transportation, since **AMP** is a single-employer with it. Of course, the Union was unaware of the single-employer relationship at the time it entered into the Stipulation.

Furthermore, **ArrMaz** cites no authority that, in order to satisfy the requirements of the constitutional Commerce Clause (or the related contractual clause), **ArrMaz** must receive, or export, product *using its own employees*, as opposed to using a completely separate and independent trucking company. The term, "affecting commerce," for purposes of the NLRA, is not so limited.

The Supreme Court has made clear that NLRB jurisdiction will apply, even when the employer might not be *directly* involved in interstate commerce, even if it is primarily involved in local activities, so long as its activities may "affect"

commerce. The Court applies the most liberal interpretation of the Commerce Clause permitted, when considering NLRB jurisdiction. *NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226–27 (1963). Contrary to ***ArrMaz***'s suggestion, there simply is no requirement that ***ArrMaz*** "receive," or "provide" product, *itself*, across state lines through use of its own employees traveling interstate – as opposed to it using an independent, unrelated contractor -- and ***ArrMaz*** has cited no such authority – in order to meet the "affecting commerce" requirement.[15/]

In order to reach the conclusion that the parties' Stipulation using "providing" and "received" in Paragraph 2 of the Stipulation was an oblique reference to ***AMP***, one would have to incorrectly assume that ***ArrMaz*** could *only* meet the "affecting commerce" test, if ***AMP*** had to be a single employer with it. However, that is not accurate. ***ArrMaz*** could still meet that "affecting commerce" test, even if ***AMP*** was not a single employer with it, or even if ***ArrMaz*** was using a separate, unrelated, independent contractor to handle its transportation needs. ***ArrMaz*** gives way too

---

[15/]The Supreme court noted, "Through the National Labor Relations Act, '* * * Congress has explicitly regulated not merely transactions or goods in interstate commerce but activities, which in isolation might be deemed to be merely local but in the interlacings of business across state lines adversely affect such commerce." *NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226–27 (1963).

much weight to these two words as somehow reflecting the parties' intentions regarding *AMP*.[16/] They don't.

*ArrMaz* confuses its analysis of the Stipulation as being "unambiguous" with its "ambiguity" argument. This confusion results from *ArrMaz* arguing that the Stipulation is unambiguous, while relying on extrinsic evidence to establish, through its single-employer theory, that the contractual term, "Employer," was meant to include *AMP*. Since there is no specific, identification, by name, of *AMP* in the Stipulation, *ArrMaz* must rely on the single-employer finding to make its "Employer" argument, a finding post-dating the Stipulation.

*ArrMaz* attempts to bolster its "unambiguity" arguments, suggesting that the Union obviously knew of the single-employer relationship with *AMP*, because trucks, that were "owned and operated by AMP Trucking, Inc." also had *Arkema* and *ArrMaz* labels on them, though the labels do not indicate which "*Arkema*," or which "ArrMaz." (R.1298-99). Such labels hardly are enough to satisfy the Board's "single employer" test. Even a wholly-owned subsidiary of a company does not,

---

[16/]The purpose of the stipulated Commerce Clause, obviously, was to confirm that the parties agreed to the Board's jurisdiction in the matter, <u>not</u> to define who the stipulating "Employer" was. If there were any doubt that *ArrMaz* met the "affecting commerce" test, the identification of the many interrelationships between the various companies identified by *ArrMaz* in its Corporate Disclosure Statement should put that issue to rest.

alone, establish a single-employer relationship.[17] The Board considers at least factors: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. *Masland Industries*, 311 NLRB 184, 186 (1993). Although none of these factors alone is determinative, the existence of centralized control of labor relations bears a special weight. *Id.*

*ArrMaz* has failed to establish that the Union was aware *at the time of entering into the Stipulation* of anything much more than a sticker, or label, on a truck. While it is likely the Union may have some knowledge of the difference between the *AMP* trucking maintenance mechanic's duties and the *ArrMaz* maintenance technicians, *ArrMaz* does not argue that the Union knew, when it signed the Stipulation, of the common ownership, or common management, or common labor relations, or the integrated tax relationships, or other evidence necessary to establish the single-employer relationship among these companies. This evidence only came out during the post-election hearing, following execution of the Stipulation.

Yet, *ArrMaz* relies on the single-employer extrinsic evidence, suggesting it supports its position that the parties both intended to use the word, "Employer," to

---

[17]It is well recognized "that merely because M T is a wholly owned subsidiary of M I, that legal relationship does not, of itself, cause the parent and subsidiary to constitute a single employer within the meaning of the Act." *Masland, supra.*

mean both ***ArrMaz*** and ***AMP,*** when they were entering into the Stipulation. Given the change in company names and the complicated ownerships described in ***ArrMaz***'s Corporate Disclosure Statement, it cannot be assumed, without more, that the Union timely was aware of sufficient credible evidence, that would confirm a single-employer relationship. There can be, and should be, no such speculation, particularly since the Stipulation, itself, makes no mention of ***AMP***, or its employees.

***ArrMaz*** – who presumably was aware of all of the evidence that might establish a single-employer relations when it signed the Stipulation -- easily could have avoided this entire controversy! [18/] How? By signing the Stipulation over the word, "Employer" as follows:

> **Arr-Maz Products, Limited Partnership** and **AMP Trucking, Inc.,**
> **as a single employer**.

That would have clearly put the Union on notice of ***ArrMaz***'s intentions, so that the Union could timely decide whether to enter into the Stipulation, seek to have it modified, or, instead, litigate the single-employer and community-of-interest issues. But ***Arr-Maz Products, Limited Partnership*** chose not to do that! ***AMP*** was

---

[18/]***ArrMaz*** may suggest that *it* was aware that *it* intended to include the challenged ***AMP*** employees in the Stipulation, but its private awareness, or intention, is irrelevant, if the Stipulation is unambiguous and/or if that "awareness" was never clearly communicated to the Union prior to the parties entering into the Stipulation. *Gendzier, infra,* at 608.

not made a party to the Stipulation, nor has it been a party to any of the proceedings in this matte!

Nevertheless, the Union submits that, whether such single-employer relationship existed, or not, simply does not matter. The Stipulation, on its face, is clear and unambiguous. The Stipulation is with the Union and ***ArrMaz***, <u>not</u> ***ArrMaz*** and ***AMP***. The parties chose to use, not the word "employer" in Paragraphs 2, 4, 8, and 9, and on the signature line of the Stipulation, but, instead, chose to use the capitalized, proper name, "Employer," to refer only to **Arr-Maz Products, Limited Partnership**, the only other party to the Stipulation! (R.1485-88).

Just as in interpreting any contract, the parties' intent must be based on what they did and knew at the time they entered into the Stipulation, not on information, that only one party, but not the other, had. ***ArrMaz***'s hidden subjective intent, when it negotiated the Stipulation, simply does not matter. *Viacom Cable, supra* at 633.

The question, here, is not whether ***AMP*** and ***ArrMaz***, legally, are in a single-employer relationship. Instead, the question for the Board was to answer, in interpreting and applying the contractual term, "Employer," was whether, *when the parties entered into the Stipulation*, they mutually intended for that term to mean more than just the employees of the company, that was signing the Stipulation*, i.e.,* employees of the separately-incorporated, *unnamed* company, ***AMP***. Here, it simply is a matter of contractual interpretation of the Stipulation.

The answer is clear. The name of the case on the Stipulation is ***Arr-Mazz Products, Limited Partnership*** and the name over the signature section of the Stipulation over the word, "Employer," is ***Arr-Maz Products, Limited Partnership***. There is no mention of ***Arkema***, as was in the original Petition; ***Arkema*** was amended *out* by Paragraph one (1), **Procedural Matters**, of the Stipulation, while the parties did not amend *in **AMP*** as a party to the Stipulation. The parties could have amended <u>in</u> ***AMP*** to the Petition -- but they didn't! The striking of ***Arkema***, without adding in ***AMP***, strongly cuts against ***ArrMaz***'s arguments that ***AMP*** impliedly was intended to be included. That, alone, is sufficient to establish an intent by both parties to exclude ***AMP*** as part of the "Employer," and, thus, not include ***AMP*** employees in the stipulated unit. The Stipulation could not be much clearer. The parties intended that the capitalized, proper noun, "Employer" was a substitute for and meant ***Arr-Maz***, *only*, period!

Contrary to ***ArrMaz***'s contention, there simply is nothing within the four-corners of the Stipulation that suggests that, at the time of entering into the Stipulation, the Union had any knowledge of ***ArrMaz***'s apparent hidden intentions, or a full understanding of the interrelationships between ***AMP***, ***Arkema***, and **ArrMaz**, and that those interrelationships might be sufficient to establish a single-employer relationship. Indeed, it appears that those relationships, somehow, may have changed, even since the representation election. (ArrMaz Br. at p. 28n.7). It

can hardly be assumed that the Union did, or could, keep up with all of those internal relationships and changes thereto.

*ArrMaz*'s reliance, then, on the Hearing Officer's *subsequent* conclusion – based on evidence developed *after* the Union entered into the Stipulation – that *AMP* and *ArrMaz* constituted a single employer -- and, thus, should be considered part of the "Employer" – is misplaced.  It is *ArrMaz*, who is putting the "cart before the horse." There is no evidence that either the Union, or the NLRB Regional Director, who approved the Stipulation, had any awareness – at the time the Stipulation was executed – of the single-employer relationship. This subsequently-established relationship does not revert back to establish, what the parties' intent was earlier! The term, Employer, in the Stipulation, as indicated by its capitalization and by *Arr-Maz*'s identification with its signature as the "Employer," clearly and unambiguously defines that term. If *ArrMaz* intended something different, the time for it making that clear to the Union and the Regional Director was *before* the Stipulation was executed, not afterwards.

*ArrMaz*'s argument that the unit description, itself, clearly includes the *AMP* maintenance technicians is based on its misplaced argument that the term, Employer, means both *AMP* and *ArrMaz*.  But the role of the NLRB, here, first, was not to determine whether *AMP* and *ArrMaz* are a "single employer," nor whether *AMP* employees should be part of the *ArrMaz* bargaining unit.  The role in a stipulated

case – as the NLRB quite correctly recognized – was to apply the definition of "Employer," that the parties, *themselves*, stipulated to, when apply their stipulated unit. The Board's finding that the contractually-defined term, Employer, did not include *AMP*, is supported by substantial evidence.

## VI. <u>Extrinsic evidence relied on by *ArrMaz* does not support its position</u>.

*ArrMaz* argues that, since the Union named *Arkema* as the employer in the original Petition, this somehow suggested that the Union wanted to include the most employees possible in the unit. That simply ignores the fact that, whatever the Union's earlier intent (on which there is no evidence to support *ArrMaz*'s contention), such "intent" arguably was replaced by the Stipulation. The Union's earlier intent – whatever it was – changed, when the Stipulation amended *Arkema* out and did so without amending *AMP* in!

*ArrMaz* also suggests that the Union knew that *AMP* was intended to be included, because it listed Strickland on the voting list. But there is no evidence that the Union had the list prior to enter into the Stipulation. Even if this post-executed Stipulation evidence were relevant, the evidence actually suggests otherwise.[19]

_____

[19]The Regional Director, in taking administrative notice of Regional documents, noted that, when *ArrMaz* submitted its voting list in 2015 (prior to the Union withdrawing that petition before an election), *ArrMaz* did <u>not</u> include then-*AMP* employee, Strickland – one of the challenged *AMP* employees now – even though he worked for *AMP* in 2015 in the same capacity as in 2020. The Union, then, had

Footnote continued on next page.

# VII. **The Stipulation is not void.**

Finally, ***ArrMaz*** belatedly raises a new issue not raised below, *i.e.*, that there was no meeting of the minds on what they meant by the contractual term, "Employer," when the parties reached agreement on the Stipulation and, therefore, the Stipulation should be ruled void, at least as to the contractual definition of Employer. ***ArrMaz*** apparently contends that its, private and unstated intention to include the ***AMP*** employees in the ***ArrMaz*** unit, when the parties entered into the Stipulation, somehow precluded a meeting of the minds on that issue and prevented the creation of an enforceable contract. ***ArrMaz*** did not raise this defense below and, thus, has waived it. Even if it had preserved that defense, it lacks merit. Private, unstated intentions are not relevant in interpreting a contract. As the Florida Supreme Court has recognized:

> The rule is probably best expressed by the late Justice Holmes in 'The Path of the Law,' 10 Harvard Law Review 457, where it was stated in

no reason to expect, when it entered into the 2020 Stipulation, that, contrary to five years before, ***ArrMaz,*** later would be attempting to insert Strickland, as a "truck maintenance mechanic" into the ***ArrMaz*** unit as a "maintenance technician." (R. 1637, 1652-43).

Any subjective, <u>un</u>communicated intention by ***ArrMaz*** to the Union prior to the parties entering into the Stipulation, that it wanted, unlike in 2015, to now include the ***AMP*** employees, simply is irrelevant. *See, Gendzier, infra* at 608.

Even assuming, then, that the RD should have moved on to the subjective intent, second-step analysis, there simply is no credible evidence that the Union intended to include the ***AMP*** employees in the stipulated unit.

part that 'The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing.'

*Gendzier v. Bielecki*, 97 So.2d 604, 608 (Fla. 1957).  *ArrMaz*'s new defense should be summarily rejected, as not raised below, and not based on any objective evidence.

## CONCLUSION

*ArrMaz* for more than three years has successfully avoided complying with its legal obligations to not only honor the Stipulation, but to honor the Union employees' election-victory with the resulting certification.  For whatever reason, *ArrMaz* apparently assumes (without evidence in the Record), that the two challenged *AMP* voters will vote, "No," and tie the vote count.  Of course, at least one of them may have voted, "Yes," confirming the Union's certification. However, as the Board correctly found, neither vote, under the Stipulation, was permitted.

One of the purposes of a Stipulation is to expedite representational proceedings, not cause them to be extended for more than three years now. This Court should not allow any further delay.  For the reasons stated and explained above, the Board's Order should be promptly enforced and/or, if the proceedings are going to be extended further, the Court should grant temporary relief and require *ArrMaz*, now, to recognize and bargain with the Union.

Dated: May 25, 2023.

Respectfully submitted,

*s/A. Randall Vehar*
A. Randall Vehar, (OH Bar 0008177)
      (EDS/Bar #000017927)
UFCW Assistant General Counsel/
    Counsel for ICWUC
ICWUC/UFCW Legal Dept., 6th Floor
1655 W. Market Street
Akron, OH 44313
330/926-1444 Ext. 115
330/926-0950 Fax
330/327-9002 Cell
rvehar@ufcw.org
rvehar@icwuc.org (alt. email)

***Counsel for International Chemical Workers Union Council of the United Food & Commercial Workers***

## <u>CERTIFICATE OF COMPLIANCE</u>

    1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains <u>10,727</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7).[20]

    2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Office Word 2016 in Times New Roman 14 point font.

Dated: May 25, 2023.

/s/*Randall Vehar*
Randall Vehar, Esq. (OH Bar #0008177)
UFCW Assistant General Counsel/
      Counsel for ICWUC

---

[20]Since the Union incorporated by reference the Jurisdiction Section of this Brief into the Law and Argument Section, Part <u>II</u>, it has included the Jurisdiction Section in the word count.

# __ADDENDUM__

# INDEX OF ADDENDUM

**BATES**

## STATUTES

29 U.S.C. SECTION 158 .................................................................................... 0001-06

29 U.S.C. SECTION 159 ................................................................................... 0007-09

29 U.S.C. SECTION 160 .................................................................................. 0010-13


## RULES

F.R.C.P., RULE 54 .......................................................................................... 0014-15


## OTHER AUTHORITIES

SECTION 11084 OF THE NLRB CASEHANDLING MANUAL, PART TWO,
 REPRESENTATION PROCEEDINGS ELECTION AGREEMENT: GENERALLY ............0017

SECTION 11084.1 OF THE NLRB CASEHANDLING MANUAL, PART TWO,
 REPRESENTATION PROCEEDINGS, DIFFERENCE BETWEEN CONSENT ELECTION
 AGREEMENT, STIPULATED ELECTION AGREEMENT AND FULL CONSENT ELECTION
 AGREEMENT ................................................................................................ 0017-18

SECTION 11088 OF THE NLRB CASEHANDLING MANUAL, PART TWO,
 REPRESENTATION PROCEEDINGS, PARTIES ........................................................0019

SECTION 11090 OF THE NLRB CASEHANDLING MANUAL, PART TWO,
 REPRESENTATION PROCEEDINGS, VARIATION NOT PERMITTED.........................0019

REPRESENTATION-CASE PROCEDURES,
 84 FED. REG. 69524-01 (DEC. 18, 2019) .................................................... 0020-21

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 29. Labor
    Chapter 7. Labor-Management Relations (Refs & Annos)
      Subchapter II. National Labor Relations (Refs & Annos)

29 U.S.C.A. § 158

§ 158. Unfair labor practices [Statutory Text & Notes of Decisions subdivisions I to VI]

Currentness

<Notes of Decisions for 29 USCA § 158 are displayed in multiple documents.>

**(a) Unfair labor practices by employer**

It shall be an unfair labor practice for an employer--

**(1)** to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

**(2)** to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

**(3)** by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

**(4)** to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

**(5)** to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

## (b) Unfair labor practices by labor organization

It shall be an unfair labor practice for a labor organization or its agents--

**(1)** to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

**(2)** to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

**(3)** to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title;

**(4)(i)** to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

**(A)** forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e);

**(B)** forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

**(C)** forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

**(D)** forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

**(5)** to require of employees covered by an agreement authorized under subsection (a)(3) the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;

**(6)** to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; and

**(7)** to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

**(A)** where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,

**(B)** where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or

**(C)** where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection.

**(c) Expression of views without threat of reprisal or force or promise of benefit**

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

**(d) Obligation to bargain collectively**

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided*, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification--

**(1)** serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

**(2)** offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

**(3)** notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

**(4)** continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2) to (4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158, 159, and 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer. Whenever the collective bargaining involves employees of a health care institution, the provisions of this subsection shall be modified as follows:

**(A)** The notice of paragraph (1) of this subsection shall be ninety days; the notice of paragraph (3) of this subsection shall be sixty days; and the contract period of paragraph (4) of this subsection shall be ninety days.

**(B)** Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given by the labor organization to the agencies set forth in paragraph (3) of this subsection.

**(C)** After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement. The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.

### (e) Enforceability of contract or agreement to boycott any other employer; exception

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible[1] and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b)(4)(B) the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.

### (f) Agreement covering employees in the building and construction industry

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3): *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

### (g) Notification of intention to strike or picket at any health care institution

A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of subsection (d). The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

## CREDIT(S)

(July 5, 1935, c. 372, § 8, 49 Stat. 452; June 23, 1947, c. 120, Title I, § 101, 61 Stat. 140; Oct. 22, 1951, c. 534, § 1(b), 65 Stat. 601; Pub.L. 86-257, Title II, § 201(e), Title VII, §§ 704(a) to (c), 705(a), Sept. 14, 1959, 73 Stat. 525, 542 to 545; Pub.L. 93-360, § 1(c) to (e), July 26, 1974, 88 Stat. 395, 396.)

Notes of Decisions (5918)

Footnotes

1      So in original. Probably should be "unenforceable".

29 U.S.C.A. § 158, 29 USCA § 158
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated

   Title 29. Labor

      Chapter 7. Labor-Management Relations (Refs & Annos)

         Subchapter II. National Labor Relations (Refs & Annos)

29 U.S.C.A. § 159

# § 159. Representatives and elections [Statutory Text & Notes of Decisions subdivisions I, II]

Currentness

<Notes of Decisions for 29 USCA § 159 are displayed in multiple documents.>

**(a) Exclusive representatives; employees' adjustment of grievances directly with employer**

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect of rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment.

**(b) Determination of bargaining unit by Board**

The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, That the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit; or (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation or (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

**(c) Hearings on questions affecting commerce; rules and regulations**

**(1)** Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board--

**(A)** by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a), or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a); or

**(B)** by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a);

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

**(2)** In determining whether or not a question of representation affecting commerce exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief sought and in no case shall the Board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its predecessor not issued in conformity with section 160(c) of this title.

**(3)** No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this subchapter in any election conducted within twelve months after the commencement of the strike. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

**(4)** Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board.

**(5)** In determining whether a unit is appropriate for the purposes specified in subsection (b) the extent to which the employees have organized shall not be controlling.

**(d) Petition for enforcement or review; transcript**

Whenever an order of the Board made pursuant to section 160(c) of this title is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsection (e) or (f) of section 160 of this title, and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

**(e) Secret ballot; limitation of elections**

**(1)** Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a)(3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

**(2)** No election shall be conducted pursuant to this subsection in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held.

## CREDIT(S)

(July 5, 1935, c. 372, § 9, 49 Stat. 453; June 23, 1947, c. 120, Title I, § 101, 61 Stat. 143; Oct. 22, 1951, c. 534, § 1(c), (d), 65 Stat. 601; Pub.L. 86-257, Title II, § 201(d), Title VII, § 702, Sept. 14, 1959, 73 Stat. 525, 542.)

Notes of Decisions (1699)

29 U.S.C.A. § 159, 29 USCA § 159
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.



KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 29. Labor
      Chapter 7. Labor-Management Relations (Refs & Annos)
         Subchapter II. National Labor Relations (Refs & Annos)

29 U.S.C.A. § 160

§ 160. Prevention of unfair labor practices [Statutory Text & Notes of Decisions subdivisions I to X]

Currentness

<Notes of Decisions for 29 USCA § 160 are displayed in multiple documents.>

**(a) Powers of Board generally**

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided*, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

**(b) Complaint and notice of hearing; answer; court rules of evidence inapplicable**

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of Title 28.

### (c) Reduction of testimony to writing; findings and orders of Board

The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: *And provided further,* That in determining whether a complaint shall issue alleging a violation of subsection (a)(1) or (a)(2) of section 158 of this title, and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

### (d) Modification of findings or orders prior to filing record in court

Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

### (e) Petition to court for enforcement of order; proceedings; review of judgment

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by

reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28.

**(f) Review of final order of Board on petition to court**

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

**(g) Institution of court proceedings as stay of Board's order**

The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the Board's order.

**(h) Jurisdiction of courts unaffected by limitations prescribed in chapter 6 of this title**

When granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by chapter 6 of this title.

**(i) Repealed. Pub.L. 98-620, Title IV, § 402(31), Nov. 8, 1984, 98 Stat. 3360**

**(j) Injunctions**

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

**(k) Hearings on jurisdictional strikes**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

**(l) Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: *Provided further*, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: *Provided further*, That such officer or regional attorney shall not apply for any restraining order under section 158(b)(7) of this title if a charge against the employer under section 158(a)(2) of this title has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b)(4)(D) of this title.

**(m) Priority of cases**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of subsection (a)(3) or (b)(2) of section 158 of this title, such charge shall be given priority over all other cases except cases of like character in the office where it is filed or to which it is referred and cases given priority under subsection (l).

CREDIT(S)

(July 5, 1935, c. 372, § 10, 49 Stat. 453; June 23, 1947, c. 120, Title I, § 101, 61 Stat. 146; June 25, 1948, c. 646, § 32(a), (b), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Pub.L. 85-791, § 13, Aug. 28, 1958, 72 Stat. 945; Pub.L. 86-257, Title VII, §§ 704(d), 706, Sept. 14, 1959, 73 Stat. 544; Pub.L. 95-251, § 3, Mar. 27, 1978, 92 Stat. 184; Pub.L. 98-620, Title IV, § 402(31), Nov. 8, 1984, 98 Stat. 3360.)

Notes of Decisions (5879)

United States Code Annotated
Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
Title VII. Judgment

Federal Rules of Civil Procedure Rule 54

# Rule 54. Judgment; Costs

Currentness

**(a) Definition; Form.** "Judgment" as used in these rules includes a decree and any order from which an appeal lies. A judgment should not include recitals of pleadings, a master's report, or a record of prior proceedings.

**(b) Judgment on Multiple Claims or Involving Multiple Parties.** When an action presents more than one claim for relief-- whether as a claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

**(c) Demand for Judgment; Relief to Be Granted.** A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.

**(d) Costs; Attorney's Fees.**

**(1) *Costs Other Than Attorney's Fees.*** Unless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 14 days' notice. On motion served within the next 7 days, the court may review the clerk's action.

**(2) *Attorney's Fees.***

**(A) *Claim to Be by Motion.*** A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.

**(B) *Timing and Contents of the Motion.*** Unless a statute or a court order provides otherwise, the motion must:

**(i)** be filed no later than 14 days after the entry of judgment;

**(ii)** specify the judgment and the statute, rule, or other grounds entitling the movant to the award;

**(iii)** state the amount sought or provide a fair estimate of it; and

**(iv)** disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

**(C)** *Proceedings.* Subject to Rule 23(h), the court must, on a party's request, give an opportunity for adversary submissions on the motion in accordance with Rule 43(c) or 78. The court may decide issues of liability for fees before receiving submissions on the value of services. The court must find the facts and state its conclusions of law as provided in Rule 52(a).

**(D)** *Special Procedures by Local Rule; Reference to a Master or a Magistrate Judge.* By local rule, the court may establish special procedures to resolve fee-related issues without extensive evidentiary hearings. Also, the court may refer issues concerning the value of services to a special master under Rule 53 without regard to the limitations of Rule 53(a)(1), and may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter.

**(E)** *Exceptions.* Subparagraphs (A)-(D) do not apply to claims for fees and expenses as sanctions for violating these rules or as sanctions under 28 U.S.C. § 1927.

## CREDIT(S)

(Amended December 27, 1946, effective March 19, 1948; April 17, 1961, effective July 19, 1961; March 2, 1987, effective August 1, 1987; April 22, 1993, effective December 1, 1993; April 29, 2002, effective December 1, 2002; March 27, 2003, effective December 1, 2003; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009.)

## ADVISORY COMMITTEE NOTES

1937 Adoption

**Note to Subdivision (a).** The second sentence is derived substantially from [former] Equity Rule 71 (Form of Decree).

**Note to Subdivision (b).** This provides for the separate judgment of equity and code practice. See Wis.Stat. (1935) § 270.54; Compare N.Y.C.P.A. (1937) § 476.

**Note to Subdivision (c).** For the limitation on default contained in the first sentence, see 2 N.D.Comp.Laws Ann. (1913) § 7680; N.Y.C.P.A. (1937) § 479. Compare *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 13, r.r. 3-12. The remainder is a usual code provision. It makes clear that a judgment should give the relief to which a party is entitled, regardless of whether it is legal or equitable or both. This necessarily includes the deficiency judgment in foreclosure cases formerly provided for by Equity Rule 10 (Decree for Deficiency in Foreclosures, Etc.).

**Note to Subdivision (d).** For the present rule in common law actions, see *Ex parte Peterson,* 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920); Payne, *Costs in Common Law Actions in the Federal Courts* (1935), 21 VA.L.Rev. 397.

The provisions as to costs in actions in forma pauperis contained in U.S.C., Title 28, former §§ 832-836 [now 1915] are unaffected by this rule. Other sections of U.S.C., Title 28, which are unaffected by this rule are: [former] §§ 815 (Costs; plaintiff

# NATIONAL LABOR RELATIONS BOARD

# CASEHANDLING MANUAL

# PART TWO

# REPRESENTATION PROCEEDINGS



**September 2020**

Available at www.nlrb.gov
Washington, D.C. 20570

0016

Accordingly, if a party wishes to request both a postponement of the hearing and a postponement of the Statement of Position or Responsive Statement of Position due date, it should be advised that the request must make that clear and must specify the reasons that postponements of both are sought. The Regional Director may postpone the time for filing and serving a Statement of Position or Responsive Statement of Position upon request of a party showing good cause. A request to postpone a Statement of Position due date will not automatically result in the postponement of a Responsive Statement of Position; rather a party must request a postponement of a Responsive Statement of Position.

### 11082.4 Place of Hearing

The place fixed for hearing will depend upon the circumstances. When possible, subject to the availability of witnesses, hearings should be set to be held in the Regional, Subregional, or Resident Office, even though the employer's facility is some distance away.

### 11082.5 Withdrawal of Notice of Hearing

If at any time after issuance (but prior to the close of a hearing), it appears that a notice of hearing should be withdrawn, the withdrawal should be contained in a letter or order signed by the Regional Director and served on the parties. The forms for consent and stipulated election agreements provide for withdrawal of the notice of hearing upon the Regional Director's approval of the agreement. Sec. 11094.

## 11084–11098    ELECTION AGREEMENT

### 11084 Election Agreement: Generally

The ultimate device by the Board in resolving a valid question concerning representation is the election by secret ballot. The voluntary agreement of the parties to hold an election without a hearing is reflected in a consent election agreement (Form NLRB-651) or stipulated election agreement (Form NLRB-652). A third election agreement option is available which provides the parties the opportunity to voluntarily agree to have the Regional Director conduct a hearing and thereafter resolve with finality all preelection factual and legal disputes. This option, full consent election agreement (Form NLRB-5509), waives the parties' rights to file a request for review of the Regional Director's decision to the Board. See OM 05-40 Revised.

### 11084.1 Difference Between Consent Election Agreement, Stipulated Election Agreement and Full Consent Election Agreement

The basic difference between the consent election agreement and the stipulated election agreement is that questions that arise after the election are decided by the Regional Director with finality in a consent election whereas they are subject to discretionary Board review in a stipulated election. In either case, disputes arising prior to the issuance of the tally of ballots are resolved by the Regional Director. In a full consent election agreement, the parties voluntarily agree to have the Regional Director conduct a hearing and thereafter resolve with finality all preelection factual and legal disputes. The parties thereby waive their rights to file a request for review of the Regional Director's decision to the Board. Likewise under the full consent election agreement procedure, all postelection disputes—

challenges and objections—would be decided by the Regional Director with no right of appeal to the Board.

## 11084.2 Obtaining Election Agreement

Efforts to dispose of a case by agreement should begin during the first contacts with the parties, and continue at all stages thereafter.

Supervisors and, if necessary, the assistant to the Regional Director or another member of management should be kept aware of all problems encountered by the Board agent in his/her efforts to secure an election agreement and should be involved in those efforts where appropriate. Board agents should remind parties that if an election agreement is reached and approved before a Statement of Position is due, the Statement of Position need not be filed. Even if an election agreement is not reached, the Board agent should seek the parties' positions and explore agreement on all issues, including issues that need not or may not be litigated in a preelection hearing.

An election under terms contrary to the statute should be neither solicited nor approved. Thus, if the Board would not assert jurisdiction, there may be no election agreement; likewise the Region must not conduct an election covering a unit that would be found clearly inappropriate under the Act, notwithstanding the consent of the parties. If the parties desire an election, however, and the Board would arguably assert jurisdiction or find the unit appropriate, the Regional Director may approve the agreement.

## 11084.3 Details of Election Agreement and Election Arrangements

An agreement that an election will be held is usually worked out with the parties over the telephone, utilizing email or facsimile transmission of proposed election agreements and other documents, or in an in-person conference. All details must be agreed on. Failure of accord in such details as date, hours, or place of election will serve to send a matter to hearing, although the petitioner's refusal to agree to an early election date may result in the dismissal of the petition. Sec. 11302.1. However, the parties may leave some election details "to be designated by the Regional Director," in which case, although substantially guided by the informally ascertained desires of the parties on such matters, the Regional Director should fix the date, hours, or place.

**NOTE:** The Regional Director may unilaterally set the date of a rescheduled or cancelled election. *Superior of Missouri, Inc.*, 327 NLRB 248 (1998); Secs. 11302.1(b) and 11314.8.

The election agreement should fully describe the agreed-upon unit and any individuals or classifications who will vote subject to challenge by agreement of the parties. The election agreement usually will not name these employees, but rather will refer to their job titles, shifts, work locations, and other descriptive factors and such language will be utilized in the notice of election. The election agreement should not state that unresolved bargaining unit issues will be left to the Regional Director.

In determining whether to recommend approval of an election agreement where challenges based on eligibility may be involved, the following factors may be considered as militating in favor of approval: the potential challenged ballots represent a class situation that could be disposed of as a single issue in a postelection proceeding; questions of eligibility will probably not be resolved in a preelection hearing because of substantial

The unit should be accurately described. If an eligibility formula is used, the period should be made explicit, e.g., "including all employees who worked an average of "x" hours per week during the "y" weeks ending on [date]." Eligibility periods are included in the Notice of Election.

## 11088   Parties

Necessary parties to an election agreement are the employer and any union (or person acting as a bargaining representative) that has submitted evidence of an interest in accordance with Secs. 11022 and 11023. In a RD case, the petitioner is also a necessary party.

A union that has submitted evidence of less than a 10-percent interest in the unit involved may not "block" an election agreement. It may, however, be a party to the agreement and participate in the election if it wishes to do so. Sec. 11023.4. A union that has disclaimed interest (Sec. 11120) is no longer a party to the case and may neither block nor be a party to an election agreement.

## 11090   Variation Not Permitted

Unless there are exceptional circumstances, the language of the printed agreement constitutes the only terms under which agreed upon elections may be held.

## 11091   Self-Determination Election

In agreed-upon self-determination elections, whether on a craft, department, or other basis, the wording in the agreement should be made to conform to Board practices in directed elections.

### 11091.1   Election Involving Professional Employees

Elections involving professional employees involve a voting procedure developed to protect their voting rights. *Pratt & Whitney,* 327 NLRB 1213 (1999); *Sonotone Corp.,* 90 NLRB 1236 (1950). In elections to ascertain the desires of *professional* employees as to their inclusion in a unit with nonprofessional employees, pursuant to Section 9(b)(1) of the Act, paragraph 9 of the election agreement, which describes the wording of choices on the ballot, should be altered to conform to the following:

Two questions shall appear on the ballot:

    1. Do you wish to be included with nonprofessional employees in a unit for the purposes of collective bargaining?

      To which the choice of answers will be "Yes" or "No."

    2. Do you wish to be represented for purposes of collective bargaining by [union]?

      To which the choice of answers will be "Yes" or "No."



## NATIONAL LABOR RELTATIONS BOARD

### 29 CFR Part 102

**RIN 3142–AA12**

### Representation-Case Procedures

**AGENCY:** National Labor Relations Board.

**ACTION:** Final rule.

**SUMMARY:** The National Labor Relations Board has decided to issue this final rule for the purpose of carrying out the provisions of the National Labor Relations Act (the Act) which protect the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection. While retaining the essentials of existing representation case procedures, these amendments modify them to permit parties additional time to comply with various pre-election requirements instituted in 2015, to clarify and reinstate some procedures that better ensure the opportunity for litigation and resolution of unit scope and voter eligibility issues prior to an election, and to make several other changes the Board deems to be appropriate policy choices that better balance the interest in the expeditious processing of questions of representation with the efficient, fair, and accurate resolution of questions of representation.

**DATES:** This rule is effective April 16, 2020.

**FOR FURTHER INFORMATION CONTACT:** Roxanne L. Rothschild, Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570–0001, (202) 273–2917 (this is not a toll-free number), 1–866–315–6572 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

### I. Background on the Rulemaking

The National Labor Relations Board administers the National Labor Relations Act which, among other things, governs the formation of collective-bargaining relationships between employers and groups of employees in the private sector. Section 7 of the Act, 29 U.S.C. 157, gives employees the right to bargain collectively through representatives of their own choosing and to refrain from such activity.

When employees and their employer are unable to agree whether employees should be represented for purposes of collective bargaining, Section 9 of the Act, 29 U.S.C. 159, gives the Board the authority to resolve the question of representation. The Supreme Court has recognized that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB* v. *A.J. Tower Co.,* 329 U.S. 324, 330 (1946). "The control of the election proceeding, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone." *NLRB* v. *Waterman Steamship Co.,* 309 U.S. 206, 226 (1940).

Representation case procedures are set forth in the statute, in Board regulations, and in Board caselaw.[1] The Board's General Counsel has also prepared a non-binding Casehandling Manual describing representation case procedures in detail.[2]

The Act itself sets forth only the basic steps for resolving a question of representation. First, a petition is filed by an employee, a labor organization, or an employer. Second, the Board investigates a petition and, if it has reasonable cause to believe that a question of representation exists, provides an appropriate hearing upon due notice, unless the parties agree that an election should be conducted and agree concerning election details. Hearing officers may conduct such pre-election hearings, but they may not make any recommendations with respect to them. Third, if, based on the record of the hearing, the Board finds that a question of representation exists, an election by secret ballot is conducted in an appropriate unit. Fourth, the results of the election are certified. The Act permits the Board to delegate its authority to NLRB regional directors. The Act also provides that, upon request, the Board may review any action of the regional director, but such review does not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director.

Within this general framework, "the Board must adopt policies and promulgate rules and regulations in order that employees' votes may be recorded accurately, efficiently and speedily." *A.J. Tower Co.,* 329 U.S. at 331. In promulgating and applying representation rules and regulations, the Board, the General Counsel[3] and the agency's regional directors have, in addition to seeking efficient and prompt resolution of representation cases, sought to guarantee fair and accurate voting, to achieve transparency and uniformity in the Board's procedures, and to update them in light of technological advances. See, *e.g.,* 79 FR 74308 (Dec. 15, 2014).

From time to time, the Board has revised its representation procedures to better effectuate these various purposes. In 2014, the Board promulgated a broad revision to those procedures, making 25 amendments in existing rules that, among other things, imposed a variety of new procedural requirements on the parties, limited the scope of pre-election hearings, and significantly contracted the timeline between the filing of a petition and the election. Certain of these amendments were controversial at the time and have remained subjects of frequent criticism since their implementation. For example, various of the Board's stakeholders have expressed concern that the current default timeframe from the filing of a petition to the pre-election hearing is too short a time in which to meet the various new obligations triggered by the filing of a petition while also adequately preparing for the hearing; that the current procedures' encouragement of deferral of disputes concerning unit scope and voter eligibility results in less fair and informed votes; and that parties may only submit post-hearing briefs when the regional director permits them to do so. Based on these concerns, as well as our independent review of the 2014 amendments, the final rule modifies those amendments in several respects—and makes further refinements that the Board believes will further clarify and improve representation case procedures—as discussed below.

### II. List of Amendments

This list provides a concise statement of the ways in which this final rule changes or codifies current practice, and the general reasoning in support. It is not "an elaborate analysis of [the] rules or of the detailed considerations upon which they are based"; rather, it "is designed to enable the public to obtain a general idea of the purpose of, and a statement of the basic justification for, the rules."[4] As this list shows, the amendments constitute discrete

---

[1] The Board's binding rules of representation procedure are found primarily in 29 CFR part 102, subpart D. Additional rules created by adjudication are found throughout the corpus of Board decisional law. See *NLRB* v. *Wyman-Gordon Co.,* 394 U.S. 759, 764, 770, 777, 779 (1969).

[2] NLRB Casehandling Manual (Part Two) Representation Proceedings.

[3] The General Counsel administratively oversees the regional directors. 29 U.S.C. 153(d).

[4] S. Rep. No. 752, at 225 (1945).

acknowledge that the first step of this framework is a new innovation, but we think it is readily justified. Given the indisputably important role that observers play in Board elections—representing their principals, challenging voters, generally monitoring the election process, and assisting the Board agent in the conduct of the election [114]—it is highly desirable that the parties' observers are drawn from those persons most interested and invested in the outcome of the election: The members of the voting unit. Of course, due to unit size, employee schedules, and an employer's operational considerations there may be times when it is not possible for a party to select a voting unit employee as its observer. In such circumstances, a party will be able to fall back on the Board's historical preference and select some other current nonsupervisory employee of the employer to serve as an observer.[115] Recognizing that there may be highly unusual situations where it is also impossible to select some other nonsupervisory employee, we have only phrased this second step in terms of "should." But to be clear, the intent of § 102.69(a)(5) is—absent agreement of the parties to the contrary—to limit observers to current nonsupervisory employees of the employer at issue.[116]

By limiting the selection of observers to nonsupervisory employees of the employer, the final rule also promotes efficiency by eliminating wasteful litigation. As our earlier discussion of observer cases makes abundantly clear, litigation over the identity of observers is a recurrent issue before the Board. It should strike the reader as peculiar that this has been the case even though the parties have no right to have observers present. Although we have no quarrel with the general policy of permitting observers, we also agree with the Third Circuit's long-ago observation that "it is obvious" that the presence of observers "is not essential to a fair election." *Southern S.S. Co.,* 120 F.2d at 506. That being the case, the Board's history of dedicating time, energy, and ink to sorting out disputes over the identity of particular observers is at the very least a questionable policy choice. In order to avoid this type of litigation, we expect that in directed elections Board agents will, going forward, simply apply § 102.69(a)(5) and disallow parties from

using nonemployee observers.[117] We likewise expect that in directed elections, regional directors will summarily overrule objections contending that a party was wrongly prevented from using a person who is not a current employee of the employer as its observer (as well as objections contending that a party impermissibly used a nonsupervisory employee of the employer as its observer).[118]

As for cases involving elections conducted pursuant to election agreements, the final rule does not disturb the overall approach to alleged breaches (*i.e.,* determining whether the breach was material), but we have decided to adopt a new interpretation of the standard "nonsupervisory-employee" language. ==Consistent with the fact that the parties should reasonably understand any reference to "employer" in an election agreement to refer to the employer who is a party to the agreement, we will no longer construe "nonsupervisory-employee" to include employees who are employed by some other employer.== Accordingly, whenever an election agreement provides that the parties "may station an equal number of authorized, nonsupervisory-employee observers" at the polling place(s), we will henceforth treat any use of an observer not employed by the signatory employer as a material breach of the election agreement. Further, because the use of a nonemployee observer constitutes a material breach of the election agreement, we will expect Board agents to disallow the use of such observers, rather than following the current procedure of permitting the use of such observers while advising the parties that this may result in the election being set aside. Moreover, if, as a result of noncompliance with the "nonsupervisory-employee" provision, a party ends up having fewer observers than the others, that party will be estopped from contending that the disparity constitutes a material breach of the agreement, insofar as the disparity will have resulted from the party's own material breach of the election agreement. See, *e.g., Republic Electronics,* 266 NLRB 852, 853 (1983) ("a party to an election is ordinarily

estopped from profiting from its own misconduct").[119]

These changes represent only a limited departure from the Board's prior practice. The Board has long preferred that parties use nonsupervisory employees as observers; we are merely curtailing the use of nonemployee observers. We do not expect that the observer issue will arise all that often, given that (1) an employer should have little issue finding a nonsupervisory employee to act as its observer; (2) a union that is either an incumbent or has already produced a sufficient showing of interest should also have little issue finding a nonsupervisory employees to act as its observer; and (3) as always, the parties remain free to stipulate to other arrangements for observers, to the extent they are willing to do so. Finally, we conclude by emphasizing that we are not setting forth any new grounds on which parties can object to the selection of observers. To the contrary, the goal in modifying § 102.69(a)(5) is to reduce (or ideally even eliminate) litigation surrounding a party's choice of observer. The parties now have clear guidance in the rules and regulations that they should be choosing nonsupervisory employees, and we have made clear here that Board agents will be empowered to police the choice of observers prior to the conduct of the election. As a result, there should be fewer grounds on which to object in the first instance, and those objections that are filed should be easily disposed of.

### B. Final Dispositions and Stays of Certifications

Prior to the 2014 amendments, regional directors issued certifications of results (including certifications of representative where appropriate) in limited circumstances, generally where no objections were filed to an election (or to a revised tally of ballots) and where challenges were not determinative. See § 102.69(b), (h) (2013); CHM section 11472 (2014). In most stipulated election cases where objections were filed or challenges were determinative, the Board would issue the certification; so too in directed election cases, unless the regional director chose to resolve challenges/objections via supplemental decision. See § 102.69(c)(3) (2013); CHM sections 11472.2, 11472.3 (2014).

As already described above, the 2014 amendments modified § 102.67(c) to provide that a request for review could

---

[114] See Casehandling Manual section 11310.3.

[115] We will continue to broadly define "employee" consistent with prior precedent. See n.108, supra. The dissent's contention that we are overruling precedent permitting the use of potential discriminatees is therefore meritless.

[116] To the extent any previous Board decisions can be read to the contrary, we overrule them.

[117] In those unusual situations where it is truly not possible for a party to use a nonsupervisory employee, a Board agent will determine whether the use of a proposed nonemployee observer is "reasonable under the circumstances," consistent with past precedent. *Kelley & Hueber,* 309 NLRB at 579 n.7. We emphasize, however, that it will be the extremely rare case in which this inquiry will be warranted.

[118] As noted above, this expectation incorporates the Board's longstanding approach to broadly defining "employee" in this context.

[119] To the extent that they are inconsistent with the principles set forth above, we overrule cases such as *Browning Ferris Industries,* 327 NLRB 704, and *Longwood Security,* 364 NLRB No. 50.

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of May, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve the counsel of record.

Further, I certify that the foregoing was served via email and regular, First Class, U.S. mail to:

Ruth E. Burdick,
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE, Ste 4159
Washington, D.C. 20570-0001
appellatecourt@nlrb.gov

Usha Dheenan,
National Labor Relations Board
1015 Half Street, SE, Ste 4159
Washington, D.C. 20570-0001
Usha.dheenan@nlrb.gov

Susan Kania,
National Labor Relations Board
1015 Half Street, SE, Ste 4159
Washington, D.C. 20570-0001
susan.kania@nlrb.gov

*Counsel for the General Counsel*

and

Bernard J. Bobber
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Pabst Boiler House
1243 North 10th Street, Suite 210
Milwaukee, WI 53205-2559
bernard.bobber@ogletree.com

Brian E. Hayes
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1909 K Street, N.W., Suite 1000
Washington, DC 20006
brian.hayes@ogletree.com

Jesse R. Dill
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Pabst Boiler House
1243 N. 10th Street, Suite 200
Milwaukee, WI 53205-2559
Jesse.dill@ogletree.com

David M. DeMaio
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
9130 South Dadeland Blvd., Suite 1625
Miami, FL 33156
David.demaio@ogletree.com

*Counsel for Respondent, ArrMaz Products, Inc.*

/s/*Randall Vehar*
Randall Vehar, Esq. (OH Bar #0008177)
UFCW Assistant General Counsel/
Counsel for ICWUC